IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

**GATLINBURG, LLC,**

    **Plaintiff,**

**v.**                                                  **No: _____**
                                                        **JURY DEMANDED**

**THE CINCINNATI INSURANCE COMPANY,**

    **Defendants.**

## COMPLAINT

COMES NOW the Plaintiff, Gatlinburg, LLC, by and through counsel, and submits the following for its Complaint against The Cincinnati Insurance Company:

**PARTIES AND JURISDICTION**

1. Gatlinburg, LLC ("Plaintiff") is a Tennessee limited liability company with its principal office located at 1100 Parkway, Gatlinburg, Tennessee. Plaintiff's members are residents of the State of Tennessee. At all times relevant hereto, Plaintiff was the owner of the structures and business personal property located at 1100 Parkway, Gatlinburg, Tennessee (the "Insured Premises").

2. The Cincinnati Insurance Company ("Defendant") is an insurance company conducting business in the State of Tennessee, including Sevier County, Tennessee. Defendant's principal place of business is located in Columbus, Ohio.

3. This Complaint originates as the result of the November 2016 wildfires and an associated windstorm that caused substantial insured losses to the structures located on the Insured Premises, and Defendant's failure and refusal to (a) promptly and fully pay Plaintiff's insurance

claim, and (b) allow the insurance policy's appraisal clause to resolve the parties' dispute concerning the amount of the loss.

4. Complete diversity of citizenship exists pursuant to 28 U.S.C. § 1332 and the amount in controversy, exclusive of interest and costs, exceeds $75,000.00. Jurisdiction and venue are proper in this Court.

## FACTS

5. At all times relevant hereto, Plaintiff was insured pursuant to an insurance contract whereby Defendant agreed to insure the commercial buildings located at the Insured Premises against property damage, bearing Policy No. INN 000 28 88 (the "Policy"). As relevant hereto, the Policy's term was December 1, 2015 to December 1, 2016. The Policy is incorporated herein by reference as if set forth verbatim, and is attached hereto as Exhibit "A."

6. At all times relevant hereto, the Insured Premises consisted of commercial buildings and surrounding area, which Plaintiff operated as a hotel presently known as the Black Bear Inn and previously known as the Clarion Inn and Suites.

7. The Policy provided insurance coverage for direct physical loss to the buildings located on the Insured Premises and such other insurance coverage as specifically set forth in the Policy.

8. The Declarations page of the Policy reveals that insurance coverage was provided for the buildings, business personal property, and loss of business income/extra expense located on the Insured Premises. The structure limit on the primary hotel building was $14,385,280.

9. The Policy was an "all-risks" policy, meaning that the Policy covered all risks of direct physical loss or damage except for those specifically excluded or limited by the Policy.

10. The Policy's coverage for the buildings and structures on the Insured Premises was on a replacement cost valuation basis, which means that coverage is provided on a replacement cost basis without deduction for depreciation.

11. Pursuant to the Policy, Plaintiff paid an annual premium to Defendant in exchange for insurance coverage. Plaintiff paid the required premiums at all times relevant to this Complaint.

12. In late November 2016, the motel buildings on the Insured Premises were infested and damaged by the accumulation of soot, ash residue, and other wildfire debris generated as a result of the Chimney Tops 2 wildfire that struck the area, resulting in substantial direct, physical loss. The direct physical loss and damage to the buildings and business personal property at the Insured Premises shall hereafter be referred to as the "Loss."

13. The Chimney Tops 2 wildfire started in the Chimney Tops area of the Great Smoky Mountains National Park, approximately 5.5 miles south of the City of Gatlinburg on November 23, 2016. A high wind-driven firestorm on November 28, 2016 and into November 29, 2016 pushed the wildfire, smoke, and embers into Gatlinburg and led to evacuation of most city residences and visitors, impacting over 2,500 structures, and resulting in three deaths in the city and eleven more in Sevier County. The evacuation order was lifted on December 9, 2016.

14. Conditions at the Insured Premises at the time of the firestorm included thick smoke, with extremely low visibility, twilight illumination, falling ash resembling snow, high winds (over seventy miles per hour), and flying debris. The interior of the hotel at the Insured Premises was smoky with fire debris in the air. Air quality remained hazy and poor for several days after the firestorm.

15. After the wildfire, Plaintiff hired All-Pro Restoration and Lyons Cleaners to perform a preliminary remediation of the Insured Premises. Work started even before the evacuation order was lifted. Plaintiff's housekeeping staff was not involved in the initial preliminary clean-up other than to sweep and vacuum ash and residue. Some business personal property, such as towels, linens, mattresses and box springs, were removed and replaced. Carpets, ceiling tiles, and upholstered furniture were cleaned. A liquid solution was applied to recently painted walls, and caused streaking, which required Plaintiff to repaint the walls after the preliminary cleanup. No post-cleanup quality inspection was conducted by Defendant or anyone else.

16. For unknown reasons, Defendant did not pay to perform any cleaning or restoration of the seventh-floor attics where the heating, ventilation and air conditioning (HVAC) units for the ballroom and penthouse suites are located. Defendant did not pay to remove, replace, or clean the HVAC units and ductwork.

17. There are two other insured buildings on the Insured Premises, a pool building and a maintenance shack. The pool building was pressure washed and the pool bottom painted after the wildfires. The maintenance shack still shows evidence of dark-colored, char-like particles on the exposed wood studs and horizontal surfaces.

18. After the Loss, the attic spaces on the third and seventh floors showed infiltration of wildfire residue through seams and gaps in the wall-roof interface, as evidenced by a thick layer of light-colored wildfire debris in ductwork insulation, metal roof framing, PVC piping, and on the attic HVAC units. Other areas of the hotel also were infested with dark-colored, char-like particles and ash-like, light colored particles. The soot and smoke residue was not present prior to the wildfires.

19. Plaintiff promptly reported the Loss to Defendant.

20. Plaintiff fulfilled all of the duties after the Loss that were imposed upon it by the Policy to the satisfaction of Defendant.

21. As it relates to the Loss, there is no applicable exclusion. The Loss is a compensable claim under the Policy.

22. Defendant has acknowledged that the Loss is a compensable claim, and has in fact made partial payments on the claim for the preliminary remediation work performed by All Pro Restoration..

23. Despite the fact that Plaintiff has fulfilled all duties imposed upon it by Defendant and is at no fault in this matter, Defendant has wrongfully refused to fully and promptly pay Plaintiff's claim for insurance proceeds.

24. The payments made by Defendant to Plaintiff were insufficient to indemnify Plaintiff for the Loss pursuant to the Policy.

25. Plaintiff advised Defendant that the payments made were insufficient to indemnify it for its losses.

26. By letter dated July 11, 2017, Plaintiff advised Defendant that it was invoking the Policy's appraisal clause because of the lack of an agreement regarding the differences between Plaintiff and Defendant regarding the amount of the loss.

27. The Policy's appraisal clause provides as follows:

**<u>Appraisal</u>**

If we and you disagree on the value of the property . . . or the amount of "loss", either may make written demand for an appraisal of the "loss". In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property . . . and amount of "loss". If they fail to agree, they will submit their

5

differences to the umpire. A decision agreed to by any two will be binding. Each party will:

    a.    Pay it chosen appraiser; and
    b.    Bear the other expenses of the appraisal and umpire equally.
If there is an appraisal, we still retain our right to deny the claim.

28. Plaintiff selected Chuck Howarth, President of The Howarth Group, as its appraiser. Defendant has refused to select an appraiser.

29. In response to Plaintiff's appraisal demand, Defendant requested that Plaintiff submit a Sworn Statement in Proof of Loss.

30. On or around October 13, 2017, Plaintiff submitted a Sworn Statement in Proof of Loss to Defendant, making claim under the Policy in the amount of $2,709,912.08. The proof of loss was accompanied by an estimate prepared by Plaintiff's appraiser, Chuck Howarth. Plaintiff also provided Defendant with lab reports from AAA Inspections which showed the presence of soot at the Insured Premises.

31. By letter dated October 20, 2017, Defendant acknowledged receipt of the Sworn Statement in Proof of Loss and advised that it was in the process of investigating the claim outlined in the proof of loss and could neither accept nor reject the proof of loss until the investigation was completed.

32. In the fall of 2017, Defendant commissioned Armour Applied Science, LLC ("Armour") to inspect the Insured Premises. Armour did inspect portions of the Insured Premises but took no soot samples and concluded any soot or smoke residue present was attributable to wood smoke from nearby restaurants.

33. By letter dated January 5, 2018, Defendant rejected Plaintiff's proof of loss, and denied Plaintiff's claim for additional payments. Defendant also refused to allow the appraisal process to proceed.

34. In April 2018, after numerous requests by Plaintiff to reconsider its position, Defendant advised that it wanted to have an engineer examine the roof structure and attic areas. Defendant also requested that a hygienist test all the areas being claimed. Plaintiff agreed to both requests.

35. Defendant never sent an engineer to inspect the Insured Premises despite its request that it be allowed to do so. Defendant did send Armour back to the Insured Premises to reinspect. This time, Armour took samples to test for the presence of wildfire residue. Armour's own test results, which were provided to Defendant earlier this year, reflect high levels of wildfire emissions, including "charred wood, charred plant, fire retardant, burnt clay, and pyrolized phytoliths."

36. In the summer of 2018, Plaintiff retained Enrique Medina, MS, CIH, CSP, FAIHA, with Alliance Consulting International, to inspect the Insured Premises to determine whether wildfire residue was present and, if needed, to prepare a restoration protocol. Mr. Enrique's specialty is wildfires, and in early 2018 he served as editor and author of the "Technical Guide for Wildfire Impact Assessments for the OEHS Professional," which was published by the American Industrial Hygiene Association.

37. Mr. Medina took nineteen samples, and upon laboratory analysis, the presence of wildfire residue in the form of char, ash, and other wildfire indicators were conclusively confirmed at extraordinarily high levels.

38. On August 10, 2018, Plaintiff provided Defendant with Mr. Medina's report, titled *Wildfire Residue Impact Assessment*. Mr. Medina concluded that all 19 samples contained large char particles, that 17 of the 19 samples contained wildfire-produced ash, that the wildfire particles were the result of the wildfire, and that the settled wildfire residue that has not been cleaned has

7

Case 3:18-cv-00465-HSM-DCP   Document 1   Filed 10/30/18   Page 7 of 15   PageID #: 7

the potential to aerosolize and disperse into the occupied space through air pathways subject to mechanical and environmental forces and to continue to emit and carry odors and affect indoor air quality. Mr. Medina also made recommendations for restoration, including, but not limited to, the following: (a) removal of the wildfire residue from the structures, (b) structural cleaning, cleaning and venting attics, (c) removal and replacement of insulation that cannot be cleaned, (d) thorough HVAC system inspection, removal and cleaning or replacement, (e) implementation of procedures for inspection of electronics and appliances for corrosiveness or electrical shorts or malfunctions, and (f) implementation of procedures for cleaning or replacement of porous materials such as fabrics, curtains, upholstery, carpets, etc. Mr. Medina also mandated post-restoration verification, including white glove inspection, surface sampling, and if necessary, clearance air monitoring to verify cleaning effectiveness, to be performed prior to any painting, sealing, coating, refinishing or encapsulating to prevent masking wildfire residue-generated odors.

39. On August 10, 2018, Plaintiff made a formal demand that its insurance claim be honored and that the appraisal process be allowed to move forward as requested. Alternatively, Plaintiff requested that Defendant pay the amounts requested in its previously submitted proof of loss. The demand was made to afford Defendant an opportunity to promptly and fully honor the insurance policy, to give notice of Plaintiff's intent to sue for bad faith if Defendant did not honor the Policy, and to memorialize the fact that Plaintiff would seek statutory damages for bad faith if Defendant failed to fully and promptly honor the Policy.

40. Wildfire residue exists in the buildings at the Insured Premises that was not present prior to the November 2016 wildfire.

41. As noted in Mr. Medina's report, the wildfire residue poses a health risk to the buildings' occupants and it is critical that appropriate restoration be accomplished. Because time is of the essence, Plaintiff requested that Defendant make immediate payment.

42. Standard protocol requires post-cleaning testing (which Defendant did not request nor pay) and Defendant has not properly paid to clean, seal, and paint numerous infested areas in the buildings.

43. By letter dated October 23, 2018, nearly twenty-three months after the wildfires, Defendant advised that it would stand by its prior denial and denied any responsibility for the claim made by Plaintiff. Defendant also reiterated its refusal to allow the appraisal process to resolve the parties' dispute concerning the amount of the loss.

44. The basis for Defendant's denial of Plaintiff's appraisal demand is that "there is no other covered loss" because all wildfire residue have been cleaned. That is not true, as evidenced by sample testing conducted by both Plaintiff's and Defendant's consultants. There are no coverage issues, but instead the parties' dispute is limited to the amount of the loss.

45. Defendant's decision to deny further payment, or even to allow appraisal to resolve the dispute, is unconscionable.

46. Defendant's proposed scope to clean the building did not appropriately remedy the deposits of smoke and soot all over and within the surfaces and cavities of the Insured Premises, including areas which Defendant has never paid to clean, repair or restore.

47. Plaintiff has not been properly compensated for the damage to its buildings. A smoke odor is still present, and soot testing has confirmed the presence of wildfire residue in places for which Defendant has not paid to clean, treat, or properly repair.

48. Defendant refused, and still refuses, to make full payment to Plaintiff for its covered loss. Defendant refused, and still refuses, to allow the contractual appraisal process to resolve the parties' dispute concerning the amount of the loss.

49. Defendant's failure and refusal to pay Plaintiff the amounts owed to it for the Loss, and Defendant's refusal to submit the dispute over the amount of loss to appraisal, is without justification, and was intentional, fraudulent, malicious and/or reckless.

50. Defendant's failure and refusal to pay the money and benefits due and owing Plaintiff under the Policy and refusal to submit the claim to appraisal has caused Plaintiff to initiate this Complaint to recover the insurance proceeds to which it is entitled.

## CAUSES OF ACTION

### Count 1 – Breach of Contract

51. The allegations contained in the paragraphs above in this Complaint are incorporated herein by reference as if set forth verbatim.

52. The Policy issued by Defendant is a binding contract and is supported by valid consideration.

53. Defendant is in total material breach of the Policy, and Defendant is liable to Plaintiff in the maximum amount allowed by the Policy for the Loss. Specifically, Defendant's breach of contract includes the following, without limitation: (a) Defendant's failure and refusal to pay the amounts owed to Plaintiff for the Loss under the Building, Personal Property, and Business Income/Extra Expenses coverages afforded by the Policy; (b) Defendant's failure and refusal to pay such other amounts to Plaintiff as may be required by the Policy; and (c) Defendant's refusal to honor Plaintiff's demand for appraisal as outlined in the Policy.

54. As a result of Defendant's breach of contract, Plaintiff has sustained substantial compensable losses for the amounts claimed under the Policy.

55. Defendant is liable to Plaintiff for its losses.

56. Defendant's breach of contract was intentional, fraudulent, malicious, and/or reckless, therefore justifying an award of punitive damages. *See, e.g., Riad v. Erie Ins. Exchange*, 436 S.W.3d 256, 276 (Tenn. Ct. App. Oct. 31, 2013). Specifically, Defendant intentionally, fraudulently, maliciously, and/or recklessly: (1) failed to effectuate a prompt and fair settlement of Plaintiff's claim when liability was reasonably clear; (2) refused and failed to conduct a reasonable, prompt, and fair investigation concerning the issues surrounding Plaintiff's claim for insurance proceeds; (3) unjustly refused and/or failed to pay Plaintiff's claim for its own financial preservation with no reasonable or justifiable basis; (4) refused payment on Plaintiff's claim for no valid reason whatsoever; (5) failed to treat Plaintiff's interests with equal regard to its own; (6) promised prompt action and claim-handling but then failed to provide any payment or even any prompt communication or status reports; (7) failed and refused to pay for obvious damage caused by the Loss; (8) failed to timely investigate, scope, and estimate the Loss; (9) knew the true facts that the buildings were damaged but falsely represented to Plaintiff that only cleaning was needed and ignored areas for which no compensation has been paid; (10) misrepresented to Plaintiff that only cleaning was needed when Defendant knew that cleaning would not resolve the soot infestation and then falsely represented to Plaintiff that the buildings had been fully cleaned when they were not and when Defendant knew it had not paid for the full restoration of all affected areas; (11) refused Plaintiff's contractual right to resolve its dispute with Defendant concerning the amount of the loss in order to protect Defendant's own financial interest to the detriment of Plaintiff ; (12) concealed important and material facts from Plaintiff in an effort to minimize the

11

amount Defendant would have to pay on the claim; (13) misrepresented relevant facts and policy provisions to Plaintiff; (14) failed to adopt and implement reasonable standards for the prompt investigation and settlement of claims; (15) forced Plaintiff to file suit to enforce its rights under the Policy; (16) represented to Plaintiff that there was no wildfire residue infestation at the Insured Premises without even first performing industry standard sample testing; and (17) such other facts and circumstances as alleged in this lawsuit and/or to be determined during discovery and which will be shown at trial. Defendant knew, or reasonably should have known, that Plaintiff was justifiably relying on the money and benefits due it under the terms of the Policy. Nevertheless, acting with conscious disregard for Plaintiff's rights and with the intention of causing or willfully disregarding the probability of causing unjust and cruel hardship on Plaintiff, Defendant consciously ignored Plaintiff's valid claim and then denied Plaintiff's claim and withheld monies and benefits rightfully due Plaintiff.

57. Plaintiff seeks, and is entitled to, punitive damages.

**Count 2 – Statutory Bad Faith**

58. The allegations contained in the paragraphs above in this Complaint are incorporated herein by reference as if set forth verbatim.

59. Defendant's refusal and failure to pay the amounts contractually owed to Plaintiff is arbitrary and capricious and constitutes bad faith pursuant to Tenn. Code Ann. § 56-7-105 in that more than sixty (60) days have passed since a formal demand has been made on Defendant and full payment has not been made for the Loss as required pursuant to the Policy for which the twenty-five percent (25%) statutory penalty for bad faith should be invoked.

60. The bad faith of Defendant is evidenced by the fact that, at all times material hereto, Defendant knew, or reasonably should have known that Plaintiff was justifiably relying on the

money and benefits due it under the terms of the Policy and as otherwise promised and represented by Defendant, as well as the actions of Defendant as set forth in paragraph 61 below and 56 above. Nevertheless, acting with conscious disregard for Plaintiff's rights and with the intention of causing or willfully disregarding the probability of causing unjust and cruel hardship on Plaintiff, Defendant consciously refused to pay in full Plaintiff's valid claim and withheld monies and benefits rightfully due to Plaintiff.

61. Defendant's bad faith is evidenced by all of the facts and allegations set forth above in this Complaint, together with the following:

   a. Defendant's intentional failure to fully inform Plaintiff of its rights and obligations under the Policy;

   b. Defendant's intentional failure to attempt in good faith to effectuate a prompt, fair and equitable settlement of Plaintiff's claim when liability was reasonably clear;

   c. Defendant's intentional refusal to pay Plaintiff's claim in full and to otherwise honor its obligations under the Policy without conducting a reasonable investigation based on all available information;

   d. Defendant's intentional refusal to fully investigate Plaintiff's claim and to obtain all available information before alleging that it had no further obligations to Plaintiff;

   e. Defendant's failure to promptly provide Plaintiff with a reasonable and accurate explanation for its refusal to pay its claim in full;

   f. Defendant's intentional failure to properly adjust Plaintiff's claim and to pay Plaintiff fully for its losses;

    g. Defendant's intentional failure to pay all amounts due and owing to Plaintiff under the Policy with no reasonable or justifiable basis; and

    h. Defendant's unjustified refusal to pay Plaintiff's claim for its own financial preservation.

62. In so acting, Defendant intended to and did injure Plaintiff in order to protect its own financial interests and should be punished via the twenty-five percent (25%) bad faith penalty authorized by statute.

WHEREFORE, as a result of the foregoing, Plaintiff would respectfully request that this Honorable Court award a judgment to Plaintiff as follows:

A. For compensatory damages to Plaintiff against Defendant not to exceed $4,000,000.00;

B. For punitive damages against Defendant in an amount to be determined by the jury but not to exceed nine times the amount of compensatory damages awarded to Plaintiff or such other amount as allowed by law;

C. For specific performance of the Policy's appraisal clause;

D. For a statutory bad faith penalty of twenty-five percent (25%);

E. For all costs incurred by Plaintiff as a result of this action;

F. For pre- and post-judgment interest; and

G. For such other further and general relief as this Court deems just and equitable.

## JURY DEMAND

Plaintiff demands a jury.

Respectfully submitted,

GILBERT McWHERTER
SCOTT & BOBBITT PLC


/s/ J. Brandon McWherter
J. BRANDON McWHERTER #21600
bmcwherter@gilbertfirm.com
JONATHAN L. BOBBITT #23515
jbobbitt@gilbertfirm.com
341 Cool Springs Blvd, Suite 230
Franklin, TN  37067
Telephone: (615) 354-1144

CLINTON H. SCOTT #23008
cscott@gilbertfirm.com
101 North Highland
Jackson, Tennessee 38301
Telephone:  (731) 664-1340

*Attorneys for Plaintiff*